JESSE POCOCK *vs.* JOSHUA HENDRICKS.—*June,* 1837.

Evidence by a justice of the peace, that when called upon by parties to prepare conveyances for them, it was his habit to inquire whether they desired absolute, or conditional conveyances, that he had no doubt such inquiry was made in the present instance, and that he never failed to shape the paper according to the expressed purpose of the parties; and that he was also in the habit of reading the papers, after they were written, to those for whom they were prepared, and especially if they were workmen : *Held* to be inadmissible.

It is for the jury to decide, whether a variety of facts and circumstances admissible as evidence, are sufficient in point of fact to prove that a bill of sale was fraudulently obtained.

If the instrument under which the plaintiff claims in an action of trover, is proved, or conceded to have been obtained by fraud, it is of no validity ; and the defendant may rely upon such invalidity as a bar to the action.

The act of assembly prohibiting the bringing or importing into this state of slaves for sale or to reside, provides, that persons brought into the state contrary to the act, if slaves before, shall thereupon immediately be free ; but to entitle the slave to his freedom in such case, the bringing into the state, must be shown to be by the owner, or by his authority, or with his approbation. If a stranger without the authority or approbation of the master, bring a slave into the state, such slave is not entitled to his freedom.

APPEAL from *Baltimore* county court.

This was an action of trover brought by *Jesse Pocock*, against *Joshua Hendricks* on the 10th May, 1832. The defendant pleaded not guilty, and limitations on which issues were joined.

At the trial of this cause, the plaintiff offered in evidence a

bill of sale-of a negro boy, named *Richard Hughes*, dated the
28th September, 1825, from *Mary Hare* to him, for the con-
sideration of $100, which was duly acknowledged, and re-
corded.

And also offered evidence, that said *Mary Hare* previous
to the year 1825, and at that time was in.the possession of
the said *Dick*, and exercised acts of ownership over him;
that soon after said bill of sale, the said boy came to the farm
of the plaintiff, and continued working there until about the
last of February, or first of March, 1828, when he went to
his former mistress, the said *Mary Hare*, who resided in the
state of *Pennsylvania*, with the said defendant; that the said
*Mary Hare* was of infirm health, and that the said *Dick*
returned to her with the consent and approbation of the plain-
tiff, who declared that he might remain in the service, and
employment of the said *Mary Hare* as long as she lived.
That the said *Mary Hare* died about the 6th of January, 1832,
and that between the 20th and 23d of the same month, of
the same year, the plaintiff demanded the said *Dick* of the
defendant, in whose possession he was in *Pennsylvania*, who
replied that the boy belonged to him, and that he would
defend him with his last cent.

The defendant then, to support the issue on his side,
offered in evidence certain depositions, taken under a com-
mission, viz:

*Maria Hutchens* deposed, that she has known *Jesse Pocock*
ever since she can remember, and that she has known *Joshua
Hendricks* for about twenty-seven, or twenty-eight years.
That she knew a coloured boy named *Dick*—thinks *Dick
Hughes*—he was the son of *Cass Johnson*, a coloured woman,
and that his father's name was *Jim*, thinks *Jim Hughes*—and
that said *Dick* or *Richard* was claimed and owned by *Sarah
Galloway*—she further states that her means of knowing the
above facts are or were as follows—about twenty-four years
ago, precise time not recollected, *Sarah Galloway* now *Sarah
Hendricks*, then residing on "*My Lady's Manor*," near
*Gunpowder falls* in *Baltimore* county, state of *Maryland*,

purchased a black woman, named *Cass Johnson*, for a term of years from *Philip Garretson*, and paid for her; and that after said *Cass* became the property of the said *Sarah Galloway*, and before said *Sarah* was married to *Joshua Hendricks*, said *Cass* had two children, one named *Joshua* and the other *Dick*, and after said *Sarah* was married, she sold *Josh* to *Charity McClung*, for $100, and said *Dick* was left with *Mary Hare*, the mother of said *Sarah Galloway*, now *Sarah Hendricks*, to wait upon her, said *Mary Hare*, as long as she the said *Mary* lived, and at said *Mary's* death, was still the property of the said *Sarah Galloway*. *Mary Hare* only claimed the services of said coloured boy *Dick*, as long as she lived—said *Sarah Galloway* lived with her mother, *Mary Hare*, before her marriage, and said blacks were kept about the house. Deponent further states, that she always understood from *Mary Hare*, that said coloured woman *Cass*, and her two children, *Josh* and *Dick*, were the property of said *Sarah Galloway*, now *Sarah Hendricks*, and that said *Mary Hare*, had, nor held, no other claim upon said coloured woman and her children, than the services of said *Dick*, as long as she the said *Mary* lived—that she recollects, that after *Sarah Galloway* was married to *Joshua Hendricks*, said coloured woman *Cass*, remained with *Mary Hare*, and had two more children, *Rachael* and *Luce*.—Witness thinks the reason why said coloured woman remained with *Mary Hare*, after said *Sarah Galloway* was married, was that she the said *Sarah* could not take her to the state of *Pennsylvania*, to which state she removed. Witness further states, that she is the daughter of the said *Mary Hare*, and is the sister of the said *Sarah Galloway*, and lived between one or two miles from her said mother's residence, in *Baltimore* county, *Maryland*, at the time she has spoken of. After said *Sarah* was married, she sold the said *Cass'* time, to whom, she does not recollect.

*Jesse Hutchens* deposes, that he has known *Jesse Pocock* ever since he has known himself, and that he has known *Joshua Hendricks* for about twenty-eight years past.—That he knew a coloured boy called *Dick*, or *Richard Hughes*—

he was the son of *Jim Hughes* and *Cass Johnson*, who were coloured people. He, witness, states that he lived, at the time he was acquainted with the facts, he has and is about to state, between one and two miles from the residence of *Mary Hare*, in *Baltimore* county, state of *Maryland*, before, at, and after the marriage of *Sarah Galloway*, to *Joshua Hendricks*, and always understood at that time, and ever since, that *Sarah Galloway* before her said marriage, purchased said coloured woman *Cass*, for a term of years, from *Philip Garretson*, and paid for her, and that said *Cass* had two children, named *Josh* and *Dick*; and he, witness, further states, that he always understood said coloured woman *Cass*, and her two children, were the property of said *Sarah Galloway*; this he understood from *Mary Hare*, the mother of the said *Sarah*. Witness further states, that he is very certain, that old *Mrs. Hare*, never claimed the black boy *Dick*, as her own property, but only the services of the said *Dick*, as long as she lived, to wait on her. *Sarah Galloway*, now *Sarah Hendricks*, before her marriage, lived with her mother *Mary Hare*, and said coloured woman, and her two children were kept on the place.—Witness recollects of *Sarah Galloway* selling the boy *Josh* to *Charity McClung*, wife of *Joseph McClung*, for $100. Witness states, that *Cass* remained with *Mary Hare*, sometime after *Sarah Galloway* was married, and removed to *Pennsylvania*.

*Joshua Green* deposes, that he is well acquainted with plaintiff and defendant, that he has seen the negro boy *Dick* frequently. He was said to belong to *Jesse Pocock*. That some time after this same black boy, now in dispute, between *Jesse Pocock* and *Joshua Hendricks*, was in the possession of *Joshua Hendricks*, I saw *Jesse Pocock*, and asked him if he was not afraid that his black boy would be free, by the laws of the state of *Pennsylvania*, to which *Jesse Pocock* replied and said, that the black boy did not belong to him, that he belonged to *Joshua Hendricks*, or he is a part of *Sally's* estate, and is none of mine.

The defendant further offered evidence to prove that *Mary*

*Hare,* came to reside with witness's father, the defendant in this cause, in the state of *Pennsylvania,* in the year 1827, and thus continued to reside until her death, which occurred about the 6th January, 1832, that said boy *Dick* came to said defendant's to be in the service of *Mrs. Hare,* in February or March of the year 1828. That shortly after he returned to *Mr. Pocock,* his former master, for his clothes, and then coming back, he remained until the first of the ensuing May, at which time he was hired to a certain *Elijah Galloway,* who resided in the city of *Baltimore* for the benefit and advantage, and by the direction of *Mrs. Hare,* where he continued until late in the following fall—that being sick, he was again carried by the daughter of *Mrs. Hare* to the state of *Pennsylvania,* where he remained about six or eight weeks, when he returned to *Galloway's* in *Baltimore,* and there staid to complete his time of two years. About the 1st September, 1830, the said boy went again to *Pennsylvania,* and immediately after worked with one *Walker,* who resided in *New Market, Maryland,* for one month; that during the one month the boy returned to defendant's every Saturday night, where his washing was done for him, that by the end of the said month, the said boy, about the 1st of October, went to the defendant's house, where he continued until about the last of March, 1831, when he was sent again to the said *Galloway's* with whom he continued to live, and with whom he was when the witness left the state of *Maryland,* on the 1st of October, 1831, to go to the state of *Ohio,* after which he knew nothing further of the said *Dick.* The defendant further offered evidence that the plaintiff and defendant lived within a mile or two of each other, the defendant in *Pennsylvania,* the plaintiff in *Maryland ;* that the said boy *Dick,* between the years 1828 and the death of *Mrs. Hare,* was frequently in the state of *Maryland,* once or twice at a husking match on the farm of the plaintiff, also at a camp meeting in the neighbourhood, and that he appeared at all times openly, and it was notorious to the neighbours that he resided with the defendant for the period above stated.

The defendant also offered evidence to prove that on the morning of the 28th of September, 1825, the plaintiff waited on *Mrs. Hare,* and requested her to give him an instrument lest he should have money to pay. Witness persuaded him to wait until *Elisha Galloway,* who was the son of *Mrs. Hare,* should return from market, and witness kept them from going for an hour, but they afterwards went—something was said in this conversation about the boy *Dick,* and his being an indemnity, and about the suit of *McClung's,* and that plaintiff said he did not wish to claim the boy unless he should be obliged to pay the money. The defendant proved that *Mrs. Hare* could not write or read writing, and then offered in evidence from the records of *Baltimore* county court, certain docket entries in four suits, the two brought by *McClung* against *Mrs. Hare,* and the others by the same persons against the plaintiff as security of *Mrs. Hare* on an administration bond, and also offered in evidence an order to enter the judgments in said suits, satisfied.

The defendant then proved that the money to satisfy said judgments had been paid to the amount of $ 117.67 by *Elisha Galloway,* the son of *Mrs. Hare.* The defendant further proved, that in a conversation which the witness had with the plaintiff a short time before *Mrs. Hare's* death, he observed, " are you not afraid that *Dick* will be free," to which the plaintiff replied, " that he had the boy as a security and he believed the money was nearly paid up." The plaintiff then further to prove the issue on his part, offered in evidence by *William A. Schaeffer,* a competent witness, that he was a magistrate, and acted in that character in the fall of 1825, that on the day of the date of the said bill of sale, he was applied to by the plaintiff and the lady who executed the same, but whom he does not think he would now know if he were to see her, to prepare an instrument of writing for them, that he accordingly wrote the said bill of sale, and witnessed the signature of *Mrs. Hare* to it, and took the acknowledgment—that it has been a long time ago, and he does not recollect the conversation when the transaction

occurred—that he is now, and was at that time, frequently called upon to prepare bills of sale and other instruments, and that he had by him forms of absolute and conditional conveyances by way of mortgage; and the plaintiff offered to prove further by the said witness that it was his habit to ask those who called upon him to prepare papers for them, whether they desired an absolute or conditional conveyance? That he has no doubt that such an interrogatory was in substance, put to the said *Mary Hare* and the plaintiff in the present instance, and that he never failed to shape the paper according to the expressed object of the parties.

To the whole of this last piece of evidence, the defendant objected as incompetent, which objection being sustained by the court, (*Purviance, A. J.*) the plaintiff excepted.

2d EXCEPTION.—The plaintiff then proved by the said witness, that he was in the habit of reading the papers after they were written, to those for whom they were prepared, and especially if they were workmen. The counsel for the plaintiff then asked the said witness whether from such his habit, he had any doubt that said bill of sale had been read to *Mrs. Hare* by him. To this question the counsel for the defendant objected on the ground, that any belief or impression of the witness drawn from his customary mode of transacting business with those who called on him to prepare papers, was incompetent evidence to go to the jury, that the said bill of sale was read to *Mrs. Hare* before she executed the same, which objection being sustained by the court, (*Purviance, A. J.*) The plaintiff excepted.

3d EXCEPTION.—The plaintiff further proved that witness went to the meadow of the defendant, late in the summer or early in the fall of 1825, and that the defendant being there, said to him, "tell your father, (that is the plaintiff in this cause) to get *Dick* from *Mrs. Hare* or he will never get any thing, and that if he, the plaintiff, did not get him, *Elisha Galloway* would," and witness accordingly repeated the above message to his father, who about two or three weeks afterwards went to the house of the defendant, who in the

presence of his wife made. the same statement in substance as herein just before stated. . The plaintiff further to support the issue on his part, offered in evidence a bill of sale from the said *Mary Hare* to *Sarah Hendricks* for negro *Cass* and her children *Rachel* and *Luce,* dated the 15th day of May, 1817, and proved the due execution thereof by the said *Mary Hare,* and the acknowledgment and recording thereof.

Whereupon the plaintiff prayed the court to instruct the jury :

1. That if they believe from the evidence that *Mary Hare* had title to the boy *Dick,* or not having title if they believe that *Hendricks* was his owner, and advised the plaintiff to get him of *Mrs. Hare,* who accordingly applied to *Mrs. Hare,* and obtained from her the bill of sale of the 28th September, 1825, and that the said bill of sale was duly executed and acknowledged, and the plaintiff obtained possession of the said boy under the same, and peaceably continued therein until October, 1828, at which time the said boy by the direction and with the consent and permission of the plaintiff, went into the service of *Mrs. Hare* for her life, and continued therein until her death, which happened about the 6th January, 1832, and that the plaintiff about the 20th and 28th of the same month and year, did demand the delivery of the said boy from the defendant, who was in possession of him, and that the defendant refused to deliver him, asserting title in himself, then the plaintiff is entitled to recover.

2. That there is no evidence in the cause from which they can infer, that the plaintiff practised any concealment, misrepresentation, or fraud, to induce the said *Mary Hare* to execute the bill of sale of the 28th September, 1825, and that all the evidence offered by the defendant, to impeach the title of the plaintiff under said bill of sale, by showing that although absolute on its face, it was yet designed by the parties, as nothing more than a mortgage or indemnity, is wholly incompetent for that purpose, and cannot be considered by the jury.

3. That if they believe the title to the negro boy *Dick* was in *Mary Hare*, or if they believe the title not being in her, but in the defendant, and that the defendant advised the plaintiff to obtain the said boy *Dick* from the said *Mary Hare*, and that said plaintiff did in accordance with this advice apply to the said *Mary*, and get from her the bill of sale mentioned in the evidence, then the plaintiff is entitled to recover; although they should find, that it was agreed by the plaintiff and the said *Mary Hare*, that the said boy should be nothing more than an indemnity to the plaintiff, in the event of any loss by her sustained in the suit then pending against him in *Baltimore* county court as surety for said *Mary Hare;* provided the jury further believed, that the said plaintiff permitted the said boy to be hired out and otherwise employed for the benefit of *Mrs. Hare* during her life only, and that after her death he did demand the delivery of the said boy, being in the possession of the said defendant, who refused the same, claiming the property in himself.

4. If the jury believe, that *Mrs. Hare* did in fact, execute and acknowledge the bill of sale of the 28th September, 1825, and that the possession of the boy was delivered to the plaintiff, that the *prima facie* title of the plaintiff and his possession there under, cannot be called in question by the defendant, and under the general issue in this suit, by any allegation of fraud practised by the plaintiff on *Mrs. Hare* in the obtension of the said bill of sale.

Which prayers being refused by the court, (*Purviance, A. J.*) the plaintiff excepted.

4th EXCEPTION.—Whereupon the counsel for the defendant prayed, that if the jury shall believe from the evidence, that the boy in question, was in the year 1828, sent by the plaintiff or with his approbation and consent, out of *Baltimore* county, state of *Maryland*, into the state of *Pennsylvania*, to live in the service of *Mrs. Hare*, at that time a resident of the ·state of *Pennsylvania*, during the balance of her life; and that the boy did actually go, and for some time remain in her service; and if the jury shall further believe

that the said boy was afterwards brought back, or sent into the state of *Maryland* to reside, that then by the laws of this state, the boy is free, and the plaintiff is not entitled to recover. Which instruction being given by the court, the plaintiff excepted.

The verdict and judgment being against the plaintiff, he prayed an appeal to this court.

The cause was argued before STEPHEN, ARCHER, DORSEY, and CHAMBERS, Judges.

R. JOHNSON, for the appellant, abandoned the first and second exceptions.

Under the third exception he insisted, that each of the four prayers offered by the plaintiff, were erroneously rejected in part, or in the whole.

1. Because upon the hypothesis of fact, stated in the first prayer, of which there was evidence *before the jury,* it was not competent for defendant to impeach the validity of the bill of sale, under which the plaintiff claimed.

2. Because, as assumed in the second prayer, there was no evidence to impeach the said bill of sale, on the ground of mistake or fraud.

3. That under the facts assumed by the third prayer, the plaintiff's title was a good one, as against the defendant.

4. That the bill of sale being executed, and the slave delivered in pursuance of it, the title was a good one as against the defendant.

Upon the fourth exception, he insisted that under the circumstances of the case, it was not in the power of the defendant to avail himself of the importation into the state of the slave in controversy, upon the hypothesis stated in the defendant's prayer.

This assumes that the plaintiff once had property in the negro, and it is predicated on all the evidence in the cause. It finds the defendant claiming title to the negro, and presents two contending parties, one demanding the slave by his action, and the other claiming to retain him. The defendant

failing to show title sets up the freedom of the negro, yielding up his own right. But freedom cannot be tried in this collateral way. The negro must assert that right, which he has not done. The prayer does not assume, that the plaintiff brought the negro back from *Pennsylvania*, nor that he was brought back to reside, or for sale. The *Pennsylvania* law is not before the court, and there is nothing which forbids a *Maryland* master, from sending his slave to *Pennsylvania*, and taking him elsewhere. The plaintiff did not bring the negro back, and if sent here by a stranger, it does not produce his freedom. Under our laws, the effect of the residence in *Pennsylvania*, is not before the court, and it is the importation into *Maryland*, which gives freedom here. The carrying out, and the importation must be voluntary, and by one of full age, and the master must assent to it.

If there is error in any one instruction, material to the plaintiff's right, there must be a procedendo.

Dorsey, Judge, delivered the opinion of the court.

The objections raised in the two first exceptions taken by the plaintiff were rightly sustained, according to the principles settled in the case of *Flack vs. Green*, 3 *Gill and John.* 474.

The next inquiry is, did the county court err in rejecting the plaintiff's four prayers in the second bill of exceptions. The propriety of granting the three first prayers depends entirely upon the question, whether there was evidence in the cause legally sufficient to have been left to the jury to find the fact; that the bill of sale from *Mary Hare* was fraudulently obtained by the plaintiff. There is no evidence other than the bill of sale itself; that any consideration was paid by the plaintiff to *Mary Hare ;* or that they stood in any relation to each other, which rendered it probable that such a bill of sale would have been executed, but upon full and adequate consideration ; nor is it in proof, that the bill of sale was ever read, or its import communicated or explained to *Mary Hare.* It is in evidence that she could neither

write, nor read writing; that by the agreement of the parties the instrument to have been executed was not an absolute bill of sale, but was intended to secure the plaintiff from loss by reason of his securityship for *Mary Hare*; that he acknowledged the negro was not his property but belonged to the defendant, (who married *Mary Hare's* daughter,) as part of his wife's estate; that he held the negro in question as security for a liability which was nearly or quite extinguished; that after obtaining the bill of sale and possession of the negro, and after his liabilities were discharged, he suffered the negro slave to go to *Mrs. Hare*, in *Pennsylvania*, and remain with her or in her service more than three years, and until the time of her death; and that when asked if he were not afraid he would lose his slave by reason of the emancipation laws of *Pennsylvania*, he replied, that he had the boy as a surety, and that he believed the money was nearly paid up.    Whether these facts are sufficient in point of fact to prove that this bill of sale was fraudulently obtained, it is the exclusive province of the jury to determine; but that they are legally sufficient to be left to the jury to be by them considered, in determining the question, we entertain no doubt. As the fourth prayer which we are called upon to decide is made upon the concession that the bill of sale was obtained by actual fraud practised by the plaintiff, we have only to say that the instrument in question being at law of no validity, we can see no reason why the defendant may not rely upon its invalidity in bar to the plaintiff's action.

In the last exception the prayer on the part of the defendant would have been rightly granted had it called on the jury to find one additional fact, viz:    That the bringing of the negro back into the state of *Maryland* to reside, was the act of the plaintiff, or was done by his authority, or with his approbation.    In granting the prayer, the county court have in effect said, that if the bringing the slave to *Maryland* to reside was the act of a stranger without the authority or approbation of the plaintiff, still the slave is entitled to his freedom.    Such a decision is neither conformable to the

letter or spirit of the act of assembly, which after prohibiting the bringing or importing into this state any slave for sale or to reside, provides that, any person brought into this state as a slave, contrary to this act, if a slave before, shall thereupon immediately cease to be the property of the person or persons so importing or bringing such slave within this state, and shall be free. We concur with the county court in sustaining defendant's objections to testimony taken in the first and second exceptions; and in all their refusals to grant the prayers made on behalf of the plaintiff, but dissent from the instruction given to the jury at the instance of the defendant's counsel as stated in the *third* exception, and therefore reverse their judgment.

JUDGMENT REVERSED AND PROCEDENDO AWARDED.